IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,190

In the Matter of MICHAEL J. GIARDINE,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed April 7, 2017. Published censure.

*Penny R. Moylan*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *Michael J. Giardine*, respondent, argued the cause pro se.

*Per Curiam*:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Michael J. Giardine, of Cimarron, an attorney admitted to the practice of law in Kansas in 2006.

On March 21, 2016, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent timely filed an answer on April 1, 2016. Respondent and the Deputy Disciplinary Administrator entered into a Stipulation on May 25, 2016. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on May 26, 2016, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 8.2(b) (2017 Kan. S. Ct. R. 377) (lawyer candidate for judicial office shall comply with applicable provisions of code of judicial conduct); Kansas Code of Judicial Conduct Rule

1

4.1(A)(4) (2017 Kan. S. Ct. R. 458) (knowingly making any false or misleading statement); and KRPC 8.4(c) (2017 Kan. S. Ct. R. 379) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"6.     On March 20, 2005, while in law school, the respondent was stopped by a Lansing, Michigan, police officer. The officer described the stop as follows:

'Reason for Contact:
On 03/20/2005 at approx. 03:33 Hrs. I was on road patrol in a fully marked patrol vehicle. I was Southbound on Washington near Kalamazoo. I observed the accused near the closed business in the 400 block of S. Washington. The accused saw me and started to walk South on Washington. The accused had on a black knit hat and sunglasses. The accused took off his sunglasses and put them in his pocket. The accused looked back and began to walk faster. I pulled up behind the accused and honked my horn. The accused looked back and kept walking. I finally opened my vehicle door and told the accused to stop walking. The accused stopped walking.

'Terry Pat Down:
The accused put his hands in his pockets as I was approaching so I had him take his hands out of his pockets, and turn around. I conducted a Terry Pat Down and during my pat down I asked the accused if he had any weapons on him or anything illegal. The accused stated "No." I asked the accused if he minded if I checked. The accused stated "Yes, I

2

mind." During my pat down of the accused's right front jacket pocket I felt something that I thought was a box cutter. I asked the accused what it was in his pocket for my safety. The accused stated "Its [*sic*] drugs. Its marijuana."

'Discovery Of Marijuana:
At that point I placed the accused in handcuffs and conducted a search of the accused. I found a green leafy substance in a plastic sandwich bag that is consistent with marijuana and a pack of zig zags in the accused's right front jacket pocket. The pack of zig zags is what I thought was the box cutter.

'Officers [*sic*] Actions:
I identified the accused and released him.'

Later, the respondent retained an attorney to defend him in the event he was charged with a crime as a result of the stop.

"7.     After graduating from law school, the respondent relocated to Olathe, Kansas.

"8.     Unbeknownst to the respondent, on July 1, 2005, the Ingham County, Michigan, prosecutor filed a complaint, charging the respondent with one count of misdemeanor possession of marijuana. A warrant for the respondent's arrest was issued that day.

"9.     In November 2005, the respondent filed his petition for admission to the bar of the State of Kansas. According to the respondent, while the respondent's application was pending, the respondent's attorney sent the respondent a letter. In the letter, the respondent's attorney informed the respondent that no charges had been filed and the attorney was closing the matter. The respondent cannot recall the name of the attorney and did not retain a copy of the letter. The respondent took the Kansas bar examination in February 2006.

3

"10.    In 2014, the respondent ran for a district court judge position in the Sixteenth Judicial District of Kansas. The respondent faced competition in the Republican primary. The election was scheduled for August 4, 2014.

"11.    On July 15, 2014, a Dodge City Daily Globe reporter contacted the respondent and told him that an anonymous source had informed the newspaper that the respondent had an outstanding arrest warrant in Ingham County, Michigan.

"12.    On July 17, 2014, the respondent forwarded a letter to the disciplinary administrator. The letter provided:

'I, Michael Giardine, an attorney in good standing, licensed to practice law in the State of Kansas, write this letter pursuant to Rule 226 of the Kansas Rules of Professional Conduct, Section 8.3, and the continuing obligation to update my Kansas Bar Association application within five (5) days of any change, inform the appropriate authority of the following and:  [*sic*]

'On July 15, 2014, I was notified by a member of the local media that information had been provided to the Dodge City Daily Globe under the condition of anonymity that a bench warrant for my arrest was issued and outstanding in Ingham County, Michigan. Up to that point, I had no knowledge of the warrant or complaint filed against me. I had never been served with a ticket, notice to appear, arrested, booked, fingerprinted, photographed or informed of this matter.

'A copy of the warrant was emailed to me showing the charge as Possession of Marijuana, with the day of offense listed as March 20, 2005. The summons shows it was issued on July 1, 2005. The warrant shows it was issued on June 28, 2005. At no point was I contacted [*sic*] any private investigator, member of the local bar association or legal community.

4

'I have retained counsel in Lansing, Michigan to defend this matter and will cooperate with your office as required by law.'

"13.    On July 21, 2014, the respondent appeared in a Michigan district court and entered a plea of guilty to one count of disorderly conduct in exchange for a dismissal of the possession of marijuana charge.

"14.    On July 22, 2014, the respondent falsely stated, to a Dodge City Daily Globe reporter, that he was not the person stopped during the March 20, 2005, incident. The respondent stated that his identification had been stolen a short time before the incident. The article provided:

'A nine-year-old charge for misdemeanor possession of marijuana and an associated warrant for the arrest of 16th Judicial District candidate Michael J. Giardine were dismissed, Monday, during a trip to Michigan to clear his name of the crime he said he did not know about or commit.

. . . .

'Giardine said he was not the person stopped during the March 20, 2005, incident in Lansing and that his Michigan resident identification card had been stolen before that date.'

The respondent's statements to the Dodge City Daily Globe reporter were published on the Dodge City Daily Globe's website and republished by the Associated Press and the Wichita Eagle.

"15.    On July 23, 2014, while speaking at a judicial candidate forum, the respondent publicly misrepresented that he was not the individual stopped during the March 20, 2005, incident.

5

"16.     On July 24, 2014, the respondent posted in the Dodge City dodgeboard.com, an online forum. The respondent's post contained false statements.

'My name is Michael Giardine. I am writing this post to clear up some misinformation that either wasn't relayed or the members of this forum have no interest in accepting. I have no interest in going point/counterpoint with anyone about the merits or any personal opinions about me. I gave my story to the Dodge City Globe immediately upon resolution of this matter. It was my hope that would clear up any questions. Obviously it did not.

'I was notified by email by a reporter with the Daily Globe on Tuesday, July 15 at approx. 1:00 p.m. that an anonymous source associated with my opponents [*sic*] campaign had delivered information to the Globe that a warrant had been issued for my arrest in the State of Michigan back in July 2005.

'That email was the FIRST time I had any idea of a warrant or pending charge.

'I immediately hired an attorney in Michigan who confirmed the warrant. I then made arrangements to travel to Michigan to address the matter.

'On Friday I read a copy of the affidavit written by the officer in the case.

'It is clear from the affidavit that there was never an arrest made, ticket issued, summons issued, booking photo taken, fingerprints taken or even a signature of the person stopped that resulted in the charges filed against me in the subsequent warrant. The Judge in Michigan, after reviewing the file, confirmed these facts after questioning me why I had not availed myself to the Court for 9 years to answer these charges.

6

'The hallmark of our criminal justice system in America is Due Process. At its essence, due process is notice and the OPPORTUNITY TO BE HEARD. There can be no question that I was never given notice of a charge until the Daily Globe notified me on July 15.

'The report simply says "information was taken" and the person released.

'I will not speculate about possibilities of how "information was taken" because that may give the impression I have more information about this incident than I really do. The sum total of my knowledge of this case is what I read in the officers' affidavit. I will state that in 2004 I had a Michigan ID card, that card was stolen from my bicycle in front of my law school. There is no mention whether my name was given or my ID was given.

'I traveled to Michigan on Sunday, July 20 [*sic*] had a hearing on Monday, July 21, and the charge of Possession of Marijuana was dismissed.

'At no time did I attempt to avoid answering to a charge or hiding from a charge. At no point did I attempt to conceal the charge from the Kansas Bar Association. I learned about the charge on July 15 and notified the Kansas Bar Association on July 17.

'Additional information:  I was informed about 2 months ago that a private investigator had been hired to investigate me for the purpose of this election. The information came from the Clerk of the Gray County District Court who called to tell me the investigator stopped by the Court asking for any records they had in which I was a named party. I was upset that the opposition would stoop so low, but also relieved that my opponent or his supporters had so little faith in their candidate to win on the merits that they would resort to bringing Washington DC style political mudslinging to rural Western Kansas.

7

'If I had any knowledge or even suspicion that I had a criminal charge in Michigan I would have been a fool not to withdraw from the race or take steps to address it immediately before a private investigator uncovered it.

'I have been subject to no less than 6 background checks since leaving the State of Michigan and none of these background checks resulted in knowledge of a warrant or criminal charges pending against me. I worked at the Wyandotte County DA's office in KCK and 2005 and had a background check for employment, I underwent an FBI background check (including required fingerprinting) in 2006 when applying to take the Kansas Bar Exam, Kansas Bar Association Character and Fitness background check the same year, Ford County Attorney's office employment background check in 2006, United States Passport Application background check in 2009, concealed carry background check in 2011, application for private pilot license background check in 2013. None of these background checks resulted in knowledge of any warrant or criminal charge in the State of Michigan.

'I have no interest in hiding from my past. As I told the Daily Globe, if anything, this experience gives me more perspective and understanding for those who find themselves in Dodge City Municipal Court. I have not campaigned on the platform of having "the highest moral character". I never want to look down my nose on someone while perched in an ivory tower of self-righteousness. I have been in Court before and I know it is terrifying. Based on that, I have always been mindful that I am dealing with good people who find themselves in a bad situation and always keep in mind that everyone is presumed innocent until proven guilty.'

"17.    On July 27, 2015, the respondent sent a second letter to the disciplinary administrator's office. That letter provided, in pertinent part, as follows:

8

'In 2014 I ran for elected office in the 16th Judicial District. A local attorney associated with my opponent hired a private investigator for purposes of influencing the election against me. The local attorney learned from the investigator that an arrest warrant had been issued for me in Ingham County, Lansing, Michigan in regards [*sic*] to the 2005 incident cited above. Instead of furnishing the information to me, or reporting the information to the Office of the Disciplinary Administrator, it was delivered to a reporter with the Dodge City Globe for publication. The information delivered included copies of the warrant, my biographical information from the Blue Book of Kansas Attorneys, and portions of the application for admission which were highlighted for emphasis, alluding I intentionally failed to disclose this incident as required. The attorney also faxed and forwarded a copy of the warrant, and a narrative stating I was fugitive from the law to each of the six district courts in the 16th District, of which some were active polling sites, in violation of state law.

1.   On July 15, 2014, at approximately 1:00 p.m. I was contacted by email by Chris Guinn with the Dodge City Globe newspaper asking me to contact him immediately.

2.   I called him immediately and was informed of the information delivered to him.

3.   This was the first time I found out about the warrant and alleged criminal charges.

4.   I asked the reporter to wait one week before publishing the story to allow me an opportunity to find out what was going on, specifically how I could go nine years without knowing a warrant

9

was issued for my arrest and to resolve the issue immediately.

5.     The reporter told me the source wanted the information published immediately and had already threatened to deliver the same information to news outlets in Hutchinson, Topeka and Wichita.

6.     The reporter informed me "[good] ole' boys club" of local attorneys were behind the private investigator and he felt I was being "railroaded".

7.     The same day I hired an attorney in Lansing, Michigan to begin working on the issue.

8.     On July 17, 2014, two days after being informed of the warrant, I self reported the allegations to the Office of the Disciplinary Administrator as required.

9.     I traveled to Lansing, Michigan on Sunday, July 20, 2014, for a hearing scheduled for the next day.

10.    In the negotiations leading up to the hearing, the state acknowledged the inability to provide my identity if the case were to proceed to trial.

11.    On Monday, July 21, 2014, I attended a hearing wherein the charge of Possession of Marijuana was dismissed and I entered a plea to Disorderly Conduct.

12. Within 15 minutes of leaving the hearing, I was contacted by reporters from Hutchinson, Wichita, and Topeka requesting a statement in regards [*sic*] to the plea.

13. On July 22, 2014, I made a statement to the Dodge City Daily Globe denying facts of the case.

14. On August 4, 2014, I lost the election.

15. I have continued working without incident since that time.

I stand ready to cooperate fully with all facets of the investigation and look forward to resolving the same.

"18. On March 21, 2016, the disciplinary administrator filed a formal complaint in the instant case. Thereafter, on April 1, 2016, the respondent filed an answer to the formal complaint. In the respondent's answer, he admitted to the facts alleged in the formal complaint, including admissions that he engaged in dishonest conduct.

"19. On May 25, 2016, the disciplinary administrator and the respondent entered into written stipulations. In the written stipulations, the respondent again admitted to the facts alleged including facts which establish that he engaged in dishonest conduct. Further, the respondent stipulated that he violated KRPC 8.2 and KRPC 8.4.

"20.    Based upon the respondent's stipulations and the above findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 8.2, KRPC 8.4, and Rule 4.1(a)(4) of the Kansas Code of Judicial Conduct, as detailed below.

"KRPC 8.2 and Rule 4.1(A)(4) of the Kansas Code of Judicial Conduct

"21.    The respondent stipulated that he violated KRPC 8.2(b). KRPC 8.2(b) provides that '[a] lawyer who is a candidate for judicial office shall comply with the applicable provisions of the code of judicial conduct.' In this case, the applicable provision of the code of judicial conduct is Rule 4.1(A)(4). That rule provides that '[a] judge or a judicial candidate shall not . . . knowingly, or with reckless disregard for the truth, make any false or misleading statement.'

"21[a].  The respondent knowingly made false and misleading statements while a judicial candidate to the newspaper reporter, at the public forum, and in the post on the Dodge City dodgeboard.com. As such, the hearing panel concludes that the respondent violated KRPC 8.2(b) and Rule 4.1(A)(4) of the Kansas Code of Judicial Conduct.

"KRPC 8.4(c)

"22.    The respondent stipulated that he violated KRPC 8.4(c). That rule provides that '[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty when he made false statements to the newspaper reporter, when he made false statements at the public forum, and when he made false statements in the post on the Dodge City dodgeboard.com. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"*American Bar Association*

*Standards for Imposing Lawyer Sanctions*

"23.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"24.     *Duty Violated*. The respondent violated his duty to the public to maintain his personal integrity.

"25.     *Mental State*. The respondent knowingly violated his duty.

"26.     *Injury*. As a result of the respondent's misconduct, the respondent caused potential injury to the legal profession.

"Aggravating and Mitigating Factors

"27.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factor present:

"28.     *Dishonest or Selfish Motive*. The respondent's misconduct was motivated by dishonesty—he provided false information to the newspaper reporter, he provided false information at the public forum, and he provided false information in the post made on the Dodge City dodgeboard.com. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty.

"29.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its

13

recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"30.     *Absence of a Prior Disciplinary Record*. The respondent has not previously been disciplined.

"31.     *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations.

"32.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the bar of Cimarron, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"33.     *Remorse*. At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct. The respondent took complete responsibility for his misconduct. The respondent did not attempt to excuse his misconduct.

"34.     In this case, two additional mitigating factors, not previously recognized by the ABA or the Kansas Supreme Court, are relevant for consideration.

"35.     *Isolated Incident of Misconduct*. The situation at hand is an isolated situation. While the respondent engaged in dishonest conduct on more than one occasion, the situation itself was one situation. Further, the circumstances are likely not to repeat. The hearing panel finds this circumstance to be important in considering the discipline to be imposed.

"36.    *Inexperienced in Elections*. The respondent previously has no experience in politics and running for election. The nature of the political process, even for judicial positions, can be combative. This situation is a case in point—the opposition hired a private investigator to review the respondent's past. The respondent's inexperience with regard to politics and running for election is also a significant mitigating factor in this case.

"37.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'5.13    Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

'7.3    Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"38.    Thus, based upon the ABA Standards, it appears that censure or suspension is typically warranted in cases such as this.

"*Recommendation*

"39.    Because the respondent engaged in dishonest conduct while a candidate for a judicial office, the disciplinary administrator recommended that the respondent be

15

suspended for a period of 1 year. The respondent recommended that he be censured and that the censure be published in the Kansas Reports.

"40.    Because of the presence of the persuasive mitigating factors, in the hearing panel's opinion, suspension is not warranted. The respondent was inexperienced in politics and in running for election. While the respondent's dishonest reaction to the political pressure is unacceptable, it appears that it was the result of youthful pride. It also appears that the respondent has learned important lessons from this experience and that the underlying circumstances are unlikely to repeat.

"41.    Accordingly, based upon the respondent's stipulations, the findings of fact, the conclusions of law, the Standards listed above, as well as the significant mitigating factors, the hearing panel unanimously recommends that the respondent be censured. The hearing panel further recommends that the censure be published in the Kansas Reports.

"42.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Kansas Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

16

Respondent was given adequate notice of the formal complaint, to which he filed an answer. Respondent was also given adequate notice of the hearing before the panel and the hearing before this court. He filed no exceptions to the hearing panel's final hearing report.

Respondent also did not object to the jurisdiction of the hearing panel or of this court. Nevertheless, in light of the unusual circumstance in which the alleged conduct potentially violates both the Kansas Rules of Professional Conduct for attorneys and the Kansas Code of Judicial Conduct, this court ordered the parties to address the question of subject matter jurisdiction at oral argument. See *Ryser v. State*, 295 Kan. 452, 456, 284 P.3d 337 (2012) (courts have duty to question jurisdiction on their own initiative). The order read:

> "The disciplinary complaint filed in this case alleged, and the hearing panel found, a violation of Rule 4.1 of the Kansas Code of Judicial Conduct (2015 Kan. Ct. R. Annot. 780) (political and campaign activities of judges and judicial candidates in general).

> "The Kansas Code of Judicial Conduct applies to judicial candidates. Kansas Supreme Court Rule 601B, Application, I(A), (D) (2015 Kan. Ct. R. Annot. 750) (applicability of this code) ('All judges shall comply with the Code . . . The term "judge" also includes a judicial candidate.'). The Code specifies that 'Canon 4 applies to judicial candidates.' Rule 601B, Application I(D).

> "The Kansas Rules of Professional Conduct (KRPC) 8.2(b) (2015 Kan. Ct. R. Annot. 669) (judicial and legal officials) provides that '[a] lawyer who is a candidate for judicial office shall comply with the applicable provisions of the code of judicial conduct.'

17

"In light of these provisions, the parties should be prepared to address the following issues at oral argument:

"(1)     Whether the Kansas Board for Discipline of Attorneys and the Kansas Commission on Judicial Qualifications have concurrent jurisdiction over alleged violations of Canon 4 of the Kansas Code of Judicial Conduct when a respondent is an attorney acting as a judicial candidate;

"(2)     Whether either the Board for Discipline or the Judicial Qualifications Commission has exclusive jurisdiction; and

"(3)     Whether this court has jurisdiction to consider the violation of Canon 4 as alleged in this action if the Board for Discipline of Attorneys lacks jurisdiction."

Responding to these questions at oral argument, the parties agreed the Board for Discipline of Attorneys, including the hearing panel that heard this complaint, and the Commission on Judicial Qualifications have concurrent jurisdiction over an allegation of misconduct arising during an attorney's candidacy for a judicial position. Nevertheless, parties may not confer subject matter jurisdiction by consent, wavier, or estoppel. See *Friedman v. Kansas State Bd. of Healing Arts*, 287 Kan. 749, 752, 199 P.3d 781 (2009). Rather, courts conduct an independent review of jurisdiction, which presents a question of law over which an appellate court exercises unlimited, de novo review. See *Ryser*, 295 Kan. at 457.

The jurisdiction of both the Board for Discipline of Attorneys and the Commission on Judicial Qualifications is established by this court through its rules. See Kansas Supreme Court Rule 602(a) (2017 Kan. S. Ct. R. 467) (establishing the Commission on Judicial Qualifications); Kansas Supreme Court Rules Relating to Discipline of

Attorneys, 201-224 (2017 Kan. S. Ct. R. 233-72) (establishing Kansas Board for Discipline of Attorneys).

Regarding discipline of attorneys, Kansas Supreme Court Rule 201(a) (2017 Kan. S. Ct. R. 233) subjects "[a]ny attorney admitted to practice law in this state . . . to the jurisdiction of the Supreme Court and the authority hereinafter established by these Rules." Kansas Supreme Court Rule 202 (2017 Kan. S. Ct. R. 233) explains the scope of this court's disciplinary power by stating: "Acts or omissions by an attorney . . . which violate the attorney's oath of office or the disciplinary rules of the Supreme Court shall constitute misconduct and shall be grounds for discipline, whether or not the acts or omissions occurred in the course of an attorney-client relationship." As relevant to this case, this jurisdiction extends to "[a] lawyer who is a candidate for judicial office," and the rules of professional conduct require an attorney who is a judicial candidate to "comply with the applicable provisions of the code of judicial conduct." KRPC 8.2(b) (2017 Kan. S. Ct. R. 378). Nothing in the rules removes an alleged KRPC 8.2(b) violation from the jurisdiction of the Disciplinary Administrator or the Board for Discipline of Attorneys.

Regarding the discipline of judges, as noted, Kansas Supreme Court rules grant the Commission on Judicial Qualifications powers related to the investigation of alleged violations of the Kansas Code of Judicial Conduct, which consists of four canons that "state general principles of judicial ethics all judges must observe." Kansas Supreme Court Rule 601B, Scope, (2) (2017 Kan. S. Ct. R. 424). "The term 'judge' also includes a judicial candidate. Canon 4 applies to judicial candidates." Kansas Supreme Court Rule 601B, Application, I(D) (2017 Kan. S. Ct. R. 428).

The rules relating to attorney and judicial discipline create an apparent overlap between the two codes: Both codes explicitly apply to an attorney who is a judicial

19

candidate. Where two bodies have subject matter jurisdiction over the subject matter of a controversy and both are proper forums for its resolution, the bodies (whether courts or other adjudicative authorities) have concurrent jurisdiction. See *State v. Russell*, 229 Kan. 124, 131, 622 P.2d 658 (1981) (stating general proposition of concurrent jurisdiction); *Eudora v. Hartig*, 68 Kan. 742, 747-48, 75 P. 1113 (1904) (discussing concurrent jurisdiction in context of deciding whether county commissioners have authority to condemn streets within city); *Shoemaker v. Brown*, 10 Kan. 383, 392, 1872 WL 710 (1872) (stating general rule that "a mere grant of jurisdiction to a particular court, without words of exclusion as to other courts previously possessing the like powers, will only have the effect of constituting the former a court of concurrent jurisdiction with the latter"). Under these principles, the Kansas Board for Discipline of Attorneys and the Commission on Judicial Qualifications have concurrent jurisdiction to investigate the misconduct involved in this case.

In light of our conclusion that the Kansas Board for Discipline of Attorneys had jurisdiction, this court likewise has jurisdiction to consider the report of the hearing panel in this case. See Kansas Supreme Court Rule 212 (2017 Kan. S. Ct. R. 255) (regarding attorney discipline proceedings before the Supreme Court). As a result, no jurisdictional impediment exists to this court's consideration of the hearing panel's report.

The respondent did not file any exceptions to that report. By operation of Supreme Court Rule 212(c), (d) (2017 Kan. S. Ct. R. 255), this means the panel's findings of fact are deemed admitted. Furthermore, the evidence before the hearing panel establishes the charged misconduct in violation of KRPC 8.2(b) (2017 Kan. S. Ct. R. 377) (lawyer candidate for judicial office shall comply with applicable provisions of code of judicial conduct); Kansas Code of Judicial Conduct Rule 4.1(A)(4) (2017 Kan. S. Ct. R. 458) (knowingly making any false or misleading statement); and KRPC 8.4(c) (2017 Kan. S. Ct. R. 379) (engaging in conduct involving dishonesty, fraud, deceit, or

misrepresentation) by clear and convincing evidence and supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the panel hearing, at which the respondent appeared, the office of the Disciplinary Administrator recommended that the respondent be suspended for a period of 1 year. Respondent recommended published censure. The hearing panel also recommended public censure.

At the hearing before this court, the office of the Disciplinary Administrator again recommended a 1-year suspension, and the respondent asked us to follow the hearing panel's recommendation of public censure. While a minority of this court would impose a more severe discipline, a majority of the court agrees with the hearing panel's recommendation that published censure is the appropriate remedy in this case.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that MICHAEL J. GIARDINE be and he is hereby disciplined by published censure in accordance with Supreme Court Rule 203(a)(3) (2017 Kan. S. Ct. R. 234).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.